## UNITED STATES DISTRICT COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>NAVIMAX CORPORATION, )<br>)<br>Defendant. )<br>————————————————— ) | Crim. No. 18-86 (MN) |

## MEMORANDUM OF PLEA AGREEMENT

The United States of America, by and through David C. Weiss, United States Attorney for the District of Delaware, Jeffery H. Wood, Acting Assistant Attorney General for the Environment and Natural Resources Division, Edmond Falgowski, Assistant United States Attorney for the District of Delaware, and John D. Cashman, Trial Attorney for the Environmental Crimes Section of the Department of Justice, (collectively referred to herein as the "government"), and the Defendant Navimax Corporation ("Navimax" or "Defendant"), by and through its authorized representative, enter into the following Memorandum of Plea Agreement ("Agreement") pursuant to Rule 11(c)(1)(C) and Rule 11(c)(3) of the Federal Rules of Criminal Procedure:

1.   <u>Waiver of Indictment and Criminal Charges</u>.  The Defendant shall waive indictment and enter a guilty plea to Counts 1 and 2 of the Information which charges:

<u>Count One</u>:  Knowing failure to maintain an accurate Oil Record Book, Part II for the M/T *NAVE CIELO*.  Specifically, on or about December 7, 2017, in the District of Delaware, and elsewhere, Defendant, by and through the acts and/or omissions of the crew on board the M/T *NAVE CIELO* for which acts and/or omissions Defendant is accepting vicarious responsibility under the principle of *respondeat superior*, did knowingly fail

and cause the failure to maintain an Oil Record Book Part II for the M/T *NAVE CIELO*. Specifically, the Defendant maintained and caused to be maintained an Oil Record Book Part II that failed to record: the failure of the Oil Discharge Monitoring Equipment ("ODME"); the accidental or other exceptional discharge of oil; and, that the ODME had been operated in manual mode and the reasons for such operation, in violation of Title 33, United States Code, Section 1908(a), Title 33 Code of Federal Regulations, Sections 151.25(e)(11), 151.25(g), and 157.37(a)(6).

Count Two:   Obstruction of an agency proceeding.   Specifically, on or about December 7, 2017, in the District Delaware, Defendant, by and through the acts and/or omissions of the crew on board the M/T *NAVE CIELO*, for which acts and/or omissions Defendant is accepting vicarious responsibility under the principle of *respondeat superior*, did corruptly influence, obstruct and impede the due and proper administration of the law under a pending proceeding by the U.S. Coast Guard, an agency within the Department of Homeland Security. Specifically, on December 7, 2017, during a U.S. Coast Guard vessel inspection of the M/T *NAVE CIELO* to determine the vessel's compliance with MARPOL and U.S. law, the Defendant:

   a. acting through the ship's Master and Chief Officer, maintained and presented and caused to be maintained and presented a falsified Oil Record Book Part II that was examined and relied upon by U.S. Coast Guard personnel, knowing that the Oil Record Book Part II was false and would be examined and relied upon by the U.S. Coast Guard;

   b. acting through the ship's Master, maintained and presented and caused to be maintained and presented a falsified Bridge Log Book, in which all significant events occurring aboard the vessel are to be recorded, but which failed to discuss the vessel significantly slowing for several hours on November 3, 2017, so that the crew could clean oil cargo-residue from the side of the ship;

   c. acting through the ship's Master and Chief Officer, maintained and presented and caused to be maintained and presented a falsified record of the vessel's Safety Management System by purposefully refusing to complete and file a checklist for

2

crewmembers working over the side of the vessel on November 3, 2017.

All in violation of Title 18, United States Code, Section 1505.

2.    <u>The Penalties</u>.    Defendant understands that the statutory penalties applicable to a corporate defendant for each felony count to which it is entering a plea of guilty are as follows: a maximum fine of either five hundred thousand dollars ($500,000), or twice the gross pecuniary gain or loss resulting from the unlawful conduct, pursuant to 18 U.S.C. § 3571(c) and (d), a term of probation of five (5) years, pursuant to 18 U.S.C. § 3561(c)(1), and a special assessment of four hundred dollars ($400), pursuant to 18 U.S.C. § 3013(a)(2)(B).   Defendant understands that, in addition to any other penalty, the Court may order the payment of restitution to any victim of the offense pursuant to the provisions of Title 18, United States Code, Section 3663. The parties are not aware of any identifiable victims of this offense.

3.    <u>Applicability of Sentencing Guidelines</u>. Defendant understands and acknowledges that, at sentencing, the Court is required to consider the United States Sentencing Guidelines ("U.S.S.G."), together with the other sentencing goals set forth in Title 18, United States Code, Section 3553(a).   Defendant understands and acknowledges that the U.S.S.G., including Chapter Eight that provides guidance for the sentencing of corporate defendants, may be considered by the Court, except that, pursuant to U.S.S.G. §§ 8C2.1 and 8C2.10, the guidelines which pertain to the

3

sentencing of organizations do not determine the fine range in cases involving environmental crimes. Instead, the fine is to be determined under 18 U.S.C. §§ 3553 and 3571. All other sections of Chapter Eight of the Sentencing Guidelines that are applicable to corporate defendants are applicable to this case.

4. <u>Sentencing</u>. Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and in return for the complete fulfillment by Defendant of all of its obligations under this agreement, the government and Defendant agree that the sentence to be imposed by the Court includes a total monetary penalty consisting of two million dollars ($2,000,000) plus the mandatory special assessment discussed below. The parties agree that the sentence should be imposed as follows:

a. <u>Criminal Fine</u>: The parties stipulate and agree that the two million-dollar ($2,000,000) total criminal fine shall be apportioned as five hundred thousand dollars ($500,000) for Count One, and one million five hundred thousand dollars ($1,500,000) for Count Two. Defendant agrees that the gross gain derived from its violation contained in Count Two of the Information was at least seven hundred fifty thousand dollars ($750,000), in accordance with 18 U.S.C. §3571(d).

b. <u>Mandatory Special Assessment</u>: Defendant shall pay a total special assessment of Eight Hundred Dollars ($800).

c. <u>Payments</u>: Defendant further agrees that if the terms of this Rule 11(c)(1)(C) Plea Agreement are accepted by the Court, that the criminal fine and special

4

assessment shall be paid on the day of sentencing, unless otherwise ordered by the Court.   Payment of the criminal fine and special assessment is to be made in the form of a check payable to "United States District Court Clerk."

d.   <u>APPS Monetary Award</u>.   Section 1908(a) of APPS provides that, in the discretion of the Court, an amount of not more than one-half of such fine attributable to the APPS count may be paid to a person or persons giving information leading to conviction. The Defendant agrees that it will not oppose any motion that the government may file in this case recommending that the Court exercise its discretion and issue a monetary award to any crewmember(s) who served on board the M/T *NAVE CIELO* and provided information leading to the conviction.

e.   <u>Probation</u>:   Defendant will be placed on organizational probation for a period of four (4) years from the date of sentencing pursuant to 18 U.S.C. § 3561(c)(1) and U.S.S.G. §§ 8D1.1 and 8D1.2.   The terms of probation shall include the following specific provisions, in addition to the Court's standard conditions for defendant corporations:

(1)   <u>No Further Violations</u>.   Defendant agrees that it shall commit no further violations of MARPOL 73/78, federal, state or local law, and shall conduct all its operations in accordance with environmental laws of the United States.

(2)   <u>Payments</u>.   Defendant agrees to make payment in full of the monetary amounts set forth herein including all special assessments and fines.

5

(3)     Environmental Management Augmentation Plan. Defendant agrees to fund and implement certain agreed augmentations of the existing Safety Management System ("SMS") applicable to Defendant's operated oil tanker vessel fleet, during Defendant's term of probation, consistent with sentencing policies set forth in U.S.S.G. § 8D1.4.   Such augmentations will be referred to as the "Environmental Management Augmentation Plan (EMAP)."    The language and details of such augmentations shall be submitted to the Court no later than forty-five (45) calendar days following acceptance of the plea agreement by the Court, and will be based solely on the following revisions to the existing SMS Manual:

a.     Chapter 10.7.6.11 will be augmented to require that a full calibration and operational inspection of the ODMEs on board all oil tanker managed vessels be conducted at least once a year by the ODME manufacturer or an authorized representative.

b.     In accordance with Chapter 6.6.16.4, the ODME manufacturer or authorized representative who comes on board the oil tanker managed vessels to conduct a calibration and operational inspection of the ODME will also conduct an onboard training session (and provide certification of same) regarding the proper operation of the ODME on board the vessel.   Such training session will be reflected in SMS Form C015, which includes a list of basic training topics for seagoing personnel.

c.     Chapter 12.2.2 sets forth the scope and parameters of the Company's internal audit program.   This program will be augmented to require that each audit includes an inspection and review of the digital ODME data, including whether the ODME is being operated properly.   Such audit item will also be added to SMS Form A 002, which is the Company's Internal Audit Checklist, with cross-references to appropriate sections in the SMS.

d.     Chapter 6.5.6 will be augmented to include the lower crew ratings for discussion and training to be conducted at fora held during the period of

6

probation.   The topics to be discussed at such fora are set forth in SMS Form C015, which will be augmented to reflect that the training sessions will highlight in detail the Company non-retaliation policy, as well as all available channels of communication and the importance of reporting to the Company all potential violations, or failures to abide by the Company policies and procedures to all crew attending such fora.

     e.     Appendix 3 of Chapter 8 of the SMS lists key "Ship Interest Contacts". Such contacts will be augmented to include the dedicated "Open Reporting Telephone" number to encourage and facilitate reporting.

Defendant will not be required to implement any changes to the SMS not listed above. The parties agree that the EMAP set forth herein shall be in lieu of a standalone Environmental Compliance Program (ECP).   In the event the Parties are unable to reach agreement in respect to the wording of the terms of the EMAP set forth herein, any such dispute will be submitted to the Court for adjudication.   Failure to reach agreement on the wording of the terms of the EMAP shall not be grounds to withdraw from this Agreement by either party.   The EMAP will be filed as a publicly available document as part of the docket of the case.   Implementation of the EMAP is a condition of probation and shall be verified through onboard audits of no more than five vessels per year calling at U.S. ports.   The audits shall be limited in scope to verifying the effective adoption and implementation of the above-listed augmentations, as well as verifying that entries made in the vessel's Oil Record Books, Parts I and II are made in accordance with the requirements of applicable MARPOL and CFR record-keeping regulations.   Such audits shall be conducted by a third-party auditor ("TPA"), who shall be selected by the government from a list of three candidates to be provided by the

7

Defendant.   If the government determines that none of the three candidates are acceptable, the Defendant will submit a list of three new candidates.   A court-appointed monitor ("CAM") will also be selected by the government from a list of three candidates to be provided by the Defendant.   The CAM will coordinate closely with the TPA, will receive TPA reports, and will meet with the company's Corporate Compliance Manager at a mutually convenient location on an annual basis to discuss results of the audits, responses to any issues raised, and new initiatives undertaken.   The CAM will report the results of its findings annually to the parties that will be listed in the EMAP.   No underway audits shall be required except, upon recommendation by the TPA, the CAM may require, for good cause shown, that one or more audits be conducted while a vessel is underway on voyages of a short duration (3-4 days maximum) only during the first three years of probation.   In the fourth year of probation, unless the term of probation has been modified or terminated in accordance with Paragraph 4 of this Agreement, the CAM can, at the Defendant's option, serve concurrently in the additional capacity of TPA under the terms of this Agreement.

(4)   Modification/Termination.   The parties agree that the Defendant may petition the Court for a modification or termination of probation, after three years of probation, provided that all of the following conditions are met: the Defendant has made all required payments under subsection (2); the Defendant has complied with all terms and provisions of the EMAP; the Defendant has not committed

any additional violations of law; and the CAM advises the government that the Defendants have fully complied with all the requirements of the EMAP under subsection (3) and otherwise recommends the requested modification or termination. The government agrees it will consider, but is not bound by, the determinations by the CAM, the Probation Office, and the Defendant's compliance with the terms of probation in its position on modification or termination of probation.

5.    Application of the Agreement.   This Agreement shall bind Defendant and all its successors and assigns.   No change in name, change in corporate or individual control, corporate reorganization, change in ownership, merger, change of legal status, sale or purchase of vessels, signing or termination of ship management contracts, or similar action shall alter the responsibilities of Defendant under this Agreement.   The Defendant shall not engage in any action to seek to avoid the obligations and conditions set forth in this Agreement.

6.    Cooperation.   As part of this Agreement, Defendant agrees that it will provide full and complete cooperation in any further investigation and/or prosecution of individuals in connection with potential violations of MARPOL, the Act to Prevent Pollution from Ships, false statements and related acts of obstruction involving the M/T *NAVE CIELO.*

7.    Statements.   This Agreement does not limit the right of the Defendant or the government to speak at the time of sentencing consistent with the provisions set

9

forth in this Plea Agreement, and to provide the Court and the United States Probation Office with evidence of all relevant conduct committed by Defendant. The parties agree that at sentencing each will support the agreed disposition set forth in this Agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.

8. <u>Non-Prosecution of Additional Offenses</u>. As part of this Agreement and the promises made by Defendant in this Agreement, the U.S. Attorney's Office for the District of Delaware and the Environmental Crimes Section of the United States Department of Justice agree to forgo criminal prosecution against the Defendant and Defendant's corporate parent(s), subsidiaries, affiliated or related companies, successors, or assigns for any additional offenses or related offenses, including but not limited to, falsification of oil record books or violations of the Act to Prevent Pollution from Ships occurring before the date of this Agreement and which are known to the government at the time of acceptance of this Agreement by the Court, whether relating to, the M/T *NAVE CIELO*, the M/T *NAVE ESTELLA,* or any other vessel within Defendant's operated oil tanker fleet. The Defendant understands and agrees that neither this paragraph nor this Agreement limit the prosecuting authority of any other sections or divisions of the Department of Justice, including the United States Attorney of any judicial district not a party to this Agreement, or any other federal, state or local regulatory or prosecuting authorities. Furthermore, this Agreement does not provide or promise any waiver of any civil or administrative actions, sanctions, or penalties that

10

may apply, including but not limited to: fines, penalties, claims for damages to natural resources, suspension, debarment, listing to restrict rights and opportunities of the Defendant to contract with or receive assistance, loans, and benefits from United States agencies, licensing, injunctive relief, or remedial action to comply with any applicable regulatory requirement.   This Plea Agreement has no effect on any proceedings against any individuals.

       9.    <u>Breach of the Agreement</u>.   If the government determines that the Defendant has failed to comply with any provision of this Agreement before the judgment is rendered, or has committed any crime within the jurisdiction of the United States during the pendency of this Agreement before judgment is rendered, the government may, at its sole option, be released from its commitments to the Defendant under this Agreement in their entirety by notifying the Defendant, through counsel or otherwise, in writing.   The government may also pursue all remedies available under the law against the Defendant irrespective of whether it elects to be released from its commitments under this Agreement.   Defendant recognizes that no such breach by it of any obligation under this Agreement shall give rise to grounds for withdrawal of its guilty plea.   The Defendant understands that should it commit any such breach of this Agreement, then the government will have the right to use against the Defendant before any grand jury, at any trial, hearing or for sentencing purposes, any statements made by Defendant's employees and agents, and any information, materials, documents or

objects provided by Defendant to the government pursuant to this Agreement without any limitation, except for any statements, information or documents provided in the course of settlement discussions pursuant to Rule 11 and FRE 410.  In this regard, Defendant hereby waives any defense to any charges which it might otherwise have under any statute of limitations, pre-indictment delay, or the Speedy Trial Act for one hundred twenty (120) days following any breach of the Agreement, except to the extent that such defenses existed as of the date of the signing of this Agreement.

10.    <u>Information for Probation Office</u>.    Defendant agrees to provide all available information requested by the United States Probation Office for the District of Delaware. The government will not object to waiving a pre-sentencing report (PSR) if such waiver is requested by Defendant.

11.    <u>Withdrawal of Agreement</u>.    Defendant's plea will be tendered pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. If the sentencing judge rejects this Agreement, then it shall be null and void at the option of either the government or the Defendant. In this regard, Defendant hereby waives any defense to any charges under any statute of limitations, for pre-indictment delay, or under the Speedy Trial Act for one hundred and twenty (120) days following any nullification or voiding of the Agreement.

12.    <u>Corporate Authorization</u>.    Defendant represents that it is authorized to enter into this Agreement and to bind itself and its subsidiaries to its terms. At the time

of signing this agreement, Defendant shall provide to the government a written statement in the form of notarized legal document certifying that Defendant is authorized to enter into and comply with all of the provisions of this Agreement. The resolution further shall certify that the Defendant's Board of Directors has authorized these actions, and that all corporate formalities for such authorizations have been observed.

13.    <u>Appellate and Other Waivers</u>.   The Defendant, through its authorized representative, is aware that 18 U.S.C. § 3742 and 28 U.S.C. §2255 afford every defendant certain rights to contest a conviction and/or sentence. Acknowledging those rights, Defendant Navimax, in exchange for the concessions made by the government in this Plea Agreement, waives the right to contest either the conviction or the sentence in any direct appeal or other post-conviction action, including any proceedings under 18 U.S.C. §2255. This waiver does not apply to claims of ineffective assistance of counsel, prosecutorial misconduct, or future changes in the law that affect Defendant Navimax's sentence. This Agreement does not limit the government in its comments in or responses to any post-sentencing matters. After acceptance of this Plea Agreement by the Court, the government will arrange for the return of all original documents, manuals, and records seized from the vessel by the U.S. Coast Guard. Defendant Navimax understands that the government might not preserve any evidence obtained in this case and in no way shall Defendant rely on the government preserving evidence for any purpose. Defendant Navimax hereby waives any claim to any physical evidence, papers,

or electronic media in the possession, custody, or control of the government, with the exception of the previously referred-to originals which are to be returned on Defendant's acceptance of the plea. Defendant Navimax waives any further disclosure or discovery from the government. Defendant Navimax further waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and further agrees not to file a request for case-related documents from any agency or department of the Executive Branch. Further, Defendant Navimax waives any right to seek attorney's fees or litigation expenses under 18 U.S.C. §3006A (the "Hyde Amendment"), and Defendant Navimax acknowledges that the government's position in the instant prosecution was not vexatious, frivolous, or in bad faith. Defendant Navimax further agrees that Navimax and any agents acting on its behalf now or in the future, waive any and all claims against the United States Coast Guard, U.S. Department of Homeland Security, or agent, employee, or contractor of either governmental entity, which relate to any aspect of the inspection, examination, and detention of the M/T *NAVE CIELO*, including any related surety or security agreement. The U.S. Coast Guard will be notified and requested to make arrangements to return the original security bond of $750,000 provided in accordance with the Security Agreement dated December 21, 2017, at the time the fine and assessment are paid in this matter.   Defendant Navimax waives all defenses and claims with regard to statute of limitations, laches, or any other arguments that any aspect of the charges is time-barred. Finally, Defendant Navimax waives any challenge to venue.

14

14.    <u>Voluntariness of the Plea</u>.    The Defendant, through its authorized representative, acknowledges that it has entered into this Agreement freely and voluntarily and that it has been fully advised by counsel, and that no threats or promises were made to induce Defendant to enter into the guilty plea called for by this Agreement.

15.    <u>Factual Basis for Guilty Plea</u>.    The factual basis is contained in Exhibit A to this Plea Agreement. If this case were to proceed to trial, the government contends that it could prove each element of the offense beyond a reasonable doubt.

16.    <u>Completeness of Agreement</u>.    The government and the Defendant acknowledge that these terms constitute the entire Agreement between the parties. No promises, agreements or conditions have been entered into other than those set forth in this Agreement.    This Agreement supersedes all prior understandings, whether written or oral.    This Agreement cannot be modified other than in a written memorandum signed by the parties or on the record in Court.    This Plea Agreement is effective upon signature by the Defendant and all of the attorneys for the government.

AGREED AND ACCEPTED

DAVID C. WEISS
United States Attorney
District of Delaware

By:  _____         Date: 11 - 7 - 18
Edmond Falgowski
Assistant United States Attorney

15

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Div.
United States Department of Justice


By: _____     Date: _31 OCT 2018_
John D. Cashman
Trial Attorney
Environmental Crimes Section
United States Department of Justice


On behalf of the Defendant Navimax Corporation, I have been authorized by a corporate resolution to sign this Agreement and bind Navimax Corporation. Navimax Corporation ("Navimax") has been advised by its attorneys of Navimax's rights, of possible defenses, of the Sentencing Guideline provisions, and of the consequences of entering into this Agreement. Navimax voluntarily agrees to all of the terms of this Agreement.   No promises or inducements have been made to Navimax other than those contained in this Agreement.   No one has threatened or forced Navimax in any way to enter into this Agreement.   Navimax is satisfied by the representation of its attorneys in this matter.

_____     Date: _10/31/18_
Authorized Representative


I am counsel for Navimax Corporation ("Navimax") and have discussed every part of this Agreement with authorized representatives of Navimax. Further, I have fully advised the authorized representatives of Navimax of their rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.   To my knowledge, the decision of Navimax to enter into this Agreement is informed and voluntary.

_____     Date: _10·31·2018_
Michael G. Chalos
K & L Gates LLP
Counsel for Defendant
Navimax Corporation


16


_This plea agreement is accepted._

_Maryellen Noreika_

Dated: 12/12/2018

## Exhibit A to Memorandum of Plea Agreement

Defendant is pleading guilty for the acts and/or omissions of the crew of the M/T *NAVE CIELO* for which it accepts responsibility vicariously under the principle of *respondeat superior,* because Defendant is, in fact, guilty under such principle. The Defendant certifies and does hereby admit that the facts set forth below are true, and were this case to go to trial, the United States maintains that it would be able to prove those specific facts and others beyond a reasonable doubt.

The M/T *NAVE CIELO* is a 42,514 gross ton ocean-going tank ship, with International Maritime Organization (IMO) Number 9301976, and registered under the flag of the Cayman Islands. Defendant Navimax Corporation was incorporated under the laws of the Republic of the Marshall Islands. Defendant Navimax Corporation (hereinafter "Navimax" or "Defendant") is a ship management oversight company that provides commercial operation and efficiency oversight to a fleet of ocean-going vessels, including the M/T *NAVE CIELO.* Such oversight includes, in part, reviewing the technical maintenance, quality, and operations of vessels, including verifying that equipment required to be aboard vessels is properly maintained and that the crews have the proper training, policies, and procedures to operate the vessels in compliance with safety and environmental laws, regulations, and best practices. The M/T *NAVE CIELO* crewmembers, including the vessel's master and chief officer, are agents of the Defendant, Navimax, and are employees of a subsidiary over which Navimax has policy-setting and operational oversight authority. The vessel's owner contracts with the subsidiary to staff the ship and

1

subsequently pay the salaries of the crew through the subsidiary.  At all times relevant to the conduct discussed herein, the agents of Defendant Navimax were acting within the scope of their employment even though the specific illegal acts were not known to, or directed, authorized, or condoned by Defendant.

On large tank ships carrying oil cargo in bulk, such as the M/T *NAVE CIELO*, the oil cargo tanks are periodically cleaned using salt water or fresh water. The washings mixture of oil and water, known as slops or oil cargo residue, settles in the cargo tanks and then is transferred to separate storage tanks for later disposal.  Depending on the ship's construction, these tanks are generally referred to as slop tanks, but may also be called residual oil tanks. As these slop tanks contain oily mixtures, the discharge of their contents to the sea is prohibited under MARPOL and U.S. law unless specific conditions are met.  To lawfully and properly discharge the contents of the slop tanks to the sea, the ship must be more than 50 nautical miles from the nearest land; proceeding en route; the instantaneous rate of oil content in the discharge must not exceed 30 liters per nautical mile at any time during the discharge operation; the total quantity of oil discharged must not exceed 1/30,000 of the total quantity of cargo previously carried; the point of discharge must be monitored visually and promptly terminated when oil is detected in the discharge; the ship must have in operation an oil discharge monitoring and control system designed to ensure the mixture being discharged is in compliance; and, the ship must be outside the "Special Areas" defined in MARPOL.  The only other option for disposal of oil cargo residue is to transfer it ashore for processing.

2

Consistent with MARPOL and the APPS regulations, a tank vessel of 150 gross tons or more must have in operation an oil discharge monitoring and control system (also known as oil discharge monitoring equipment ("ODME")) that functions effectively and automatically under all environmental conditions normally encountered by oil tankers such that the discharge of oil-contaminated water from the cargo tank areas cannot take place unless the monitoring system is in the normal operating mode.  33 C.F.R. § 157.12d(a). The monitoring system must be comprised of: an "oil content meter" to measure the oil content of the effluent; a "flow rate indicating system" (or "flow meter") to measure the rate of effluent being discharged; a "ship's speed indicating device;" a "ship position indicating device;" a sampling system to convey a representative sample of the effluent to the oil content meter; an "overboard discharge control" to stop the discharge; an "interlock" to prevent the discharge overboard of any effluent unless the system is fully operational; and, a control system that processes the information. 33 C.F.R. § 157.12d(a)(4). The APPS regulations provide for manually-operated alternatives in the event of equipment malfunction, to include failure of the flow meter, and the APPS regulations require the activation of audio-visual alarms and that the discharge of effluent into the sea is stopped automatically whenever the instantaneous rate of discharge of oil exceeds 30 liters per nautical mile. 33 C.F.R. § 157.12d(j), (k). The discharge monitoring system may be operated manually only if the automatic system fails during a ballast voyage; the failure is recorded in the Oil Record Book; the master of the vessel ensures the discharge is constantly monitored

3

visually and promptly terminated when oil is detected in the discharge; and the system is operated manually only until the ballast voyage is completed. 33 C.F.R. § 157.37(a)(6).

Consistent with the requirements contained in the MARPOL Protocol, APPS regulations require that an oil tanker of 150 gross tons and above maintain an Oil Record Book Part II ("Oil Record Book" or "ORB") in which are recorded all discharges of water from slop tanks, disposal of oil residue, and any failure of the oil discharge monitoring and control system along with the reasons for the failure. 33 C.F.R. § 151.25(a), (e). Specifically, discharges of the contents of cargo and slop tanks must be fully recorded, without delay, in the Oil Record Book by the person in charge of the operation and each completed page of the Oil Record Book shall be signed by the master or other person having charge of the ship. 33 C.F.R. § 151.25(h). The Oil Record Book must also contain entries concerning any emergency, accidental, or other exceptional discharges of oil or oily mixtures including a statement of the circumstances of, and the reasons for, the discharge. 33 C.F.R. § 151.25(g). The Oil Record Book must be kept onboard the ship and made readily available for inspection at all reasonable times, and must be preserved for a period of three years after the last entry has been made. MARPOL Annex I, Regulation 36 and 33 C.F.R. § 151.25(i), (k).

In accordance with industry practice and the specific Safety Management System for the M/T *NAVE CIELO*, the Chief Officer is responsible for cargo operations including the washing of cargo tanks, management of cargo slops, and

4

operation of the ODME. The Master of the vessel, also known as the Captain, has overall responsibility for the entire ship and crew and is typically the most senior person onboard the vessel. The Chief Officer is the next most senior crewmember to the Master and, as the person in charge of the ODME operation, is responsible for making proper entries in the ORB. Each completed page of the ORB is reviewed and signed by the Master. Three different masters served aboard the M/T *NAVE CIELO* between March and December 2017; the first arrived onboard on October 27, 2016, and departed on May 8, 2017; the second overlapped with the first, having arrived onboard on April 20, 2017, and departed on November 14, 2017; and the third reported onboard on November 10, 2017, and was onboard when the vessel entered the United States and called in the port of Delaware Bay, Delaware.

Onboard the M/T *NAVE CIELO* the ODME was operated on eleven separate occasions between March 21, 2017 and September 20, 2017: specifically, March 21, 23, 24, 26; June 19; August 12, September 12, 18, 19 (twice), and 20. During each operation, the values for the flow rate of the discharge pump were entered manually into the ODME instead of the flow rate being automatically read from the flow meter, indicating a failure of the automatic system. Two different Chief Officers served during this time period and despite knowing that the ODME was operating with manual input, neither Chief Officer recorded a failure of the automatic ODME system as would be required under MARPOL Annex I, Regulations 31, 34, and 36 and 33 C.F.R. §§ 151.25(e), 157.37(a)(6).

5

While the vessel was moored in Luanda, Angola, a port official informed the vessel's crew that there were dark marks along the port side of the ship. The Captain of the M/T *NAVE CIELO* directed the crew to clean the side of the hull, and on the afternoon of April 4, 2017, after departing Luanda, the ship slowed for approximately three hours so that crewmembers could be lowered over the side to clean the hull in the vicinity of the ODME discharge port. In September 2017, following operation of the ODME, a crewmember was lowered over the side of the vessel to paint over marks on the hull in the vicinity of the ODME discharge port. The crewmember who painted the hull understood the marks were from discharged cargo slops and that it was easier to paint over the marks than it was to clean them off of the hull.

On October 30, 2017, the Captain of the M/T *NAVE CIELO* directed the Chief Officer to discharge the contents of the Residue Oil Tank (ROT) using the ODME system. The Chief Officer complied but thought the ROT did not need to be emptied as it was slightly less than half full. Approximately a quarter of the ROT contents, about 27 cubic meters of liquid, was discharged through the ODME system and approximately 70 cubic meters of cargo slops remained in the tank.

On November 1, 2017, the Captain requested a written report from the Chief Officer as to the amount of liquid in the ROT. After providing the report, the Captain directed the Chief Officer to discharge additional liquid from the ROT using the ODME system. On November 2, 2017, at the direction of the Chief Officer, the ship's Bosun assigned another crewmember to observe the ODME discharge and

6

report what he saw via hand-held radio. The Chief Officer and the Captain oversaw the ODME operation from the ship's cargo control room but could not observe the actual discharge from that location, hence the assignment of a lookout.

The Chief Officer started the discharge process through the ODME and the lookout initially reported over the radio that the water being discharged appeared clean. After approximately 10 minutes, the lookout reported that the discharge was becoming visibly darker or brownish. During the entire discharge operation, the ODME's oil content meter, which is intended to measure the oil content of the effluent being discharged through the ODME, registered oil content readings of less than 1,000 parts per million ("PPM") which is the maximum oil content that the ODME will allow to be discharged before the discharge is automatically stopped and the discharge valve is shut. The Chief Officer left the cargo control room, looked over the side of the ship, observed the discharge to be light brown, and concluded that the discharge should stop. The Chief Officer returned to the cargo control room, informed the Captain that the overboard discharge was discolored, and he intended to stop the pump. The Captain ordered the operation to continue. The lookout made several additional reports indicating that the liquid being discharged was becoming progressively darker in color, eventually going from brown to black. The Chief Officer again went to the side of the ship to observe the discharge and upon observing it as a dark brown color, returned to the cargo control room and stopped the pump. The total operation lasted slightly more than 20 minutes and approximately 27 cubic meters of liquid was discharged through the ODME system.

7

Following the ODME operation, measurement of the ROT indicated 10 centimeters depth of remaining water (approximately 10 cubic meters) with roughly another 40 cubic meters of cargo slops in the tank.

The crewmember assigned to observe the ODME discharge took two videos, each lasting approximately fifteen seconds, of the ODME discharge with his cellphone. He shared the videos with a few other members of the crew, one of whom later contacted the U.S. Coast Guard to report what he believed was the unlawful discharge of oil into the ocean and provide copies of the videos.

The following day, November 3, 2017, the Captain directed members of the crew to clean the side of the ship near the ODME discharge point. The ship significantly slowed so as to make conditions safer for the crewmember working over the side of the ship. The ship's Safety Management System checklist for working over the side was not completed and the vessel significantly altering its speed for several hours was not recorded in the ship's logbook per the Captain's order. The Captain further directed that neither information about the discharge of slops into the sea nor the apparent malfunction of the ODME should be recorded in the ORB. The Chief Officer completed and signed entries for the ODME operation on November 2, 2017, knowing that the Oil Record Book contained false and misleading information. The Captain signed each page of the Oil Record Book, including the page with the November 2, 2017, entries, knowing that the ORB contained false and misleading information. None of these events or failure to record were reported to the Defendant, notwithstanding its clear policies and

procedures that required all such events to be recorded and reported to the company, and for which the Defendant provides training.

Because the aforementioned failure of the ODME was not properly recorded in the Oil Record Book, Defendant, acting through its agents, who acted, at least in part, with the intent to benefit Defendant, knowingly maintained a false record aboard the M/T *NAVE CIELO* while in U.S. waters.

On or about December 7, 2017, the U.S. Coast Guard conducted an inspection of the M/T NAVE CIELO in Delaware Bay to determine compliance with U.S. law. Prior to the inspection, Coast Guard officials received information from a crewmember that the vessel may have discharged oil cargo residue overboard during a prior voyage from the United States to Belgium. During the Coast Guard inspection on December 7, 2017, Coast Guard inspectors examined the Oil Record Book and identified an absence of any entries indicating that the ODME failed to operate properly on November 2, 2017, or that oil cargo slops were discharged in excess of the allowed concentration, nor did the ORB contain entries indicating that the system was previously operated with manual inputs between March and September 2017.

When Coast Guard inspectors asked that Chief Officer about the ODME operations on November 2, 2017, he initially denied that any oil was discharged over the side or that anything unusual occurred during the ODME operation on November 2, 2017. The Chief Officer also initially denied that the vessel stopped so that crewmembers could clean the side of the ship on November 3, 2017.

9

Following the Coast Guard's commencement of the inspection, the Chief Officer approached the crewmember who cleaned the side of the hull on November 3, 2017, and asked what he had told the Coast Guard and told the crew member that he should have told the Coast Guard he did not know what he was cleaning and that it could have been mud.  The Chief Officer approached a second crewmember who assisted with the cleaning of the hull and told him to tell the Coast Guard that the discharge was not oil, but rather dirty water from the tank. The Chief Officer also approached the crewmember who served as the lookout during the discharge on November 2, 2017, and told him to tell the Coast Guard that the water discharged through the ODME was clean.

For the government:

11.7.18

Edmond Falgowski
Assistant United States Attorney

John D. Cashman
Trial Attorney
Environmental Crimes Section

For the Defendant Navimax Corporation:

Michael G. Chalos
K & L Gates LLP
Counsel for Defendant

10